# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 5, 2025　　　　Decided August 11, 2026

No. 24-5278

FRIENDS OF ANIMALS,
APPELLEE

v.

MARTHA WILLIAMS, IN HER OFFICIAL CAPACITY AS PRINCIPAL
DEPUTY DIRECTOR AND UNITED STATES FISH AND WILDLIFE
SERVICE, AN AGENCY OF THE UNITED STATES,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-02081)

———

*Christopher Anderson*, Attorney, U.S. Department of
Justice, argued the cause for appellants. With him on the briefs
were *Adam R.F. Gustafson*, Acting Assistant Attorney General,
*Robert N. Stander*, Deputy Assistant Attorney General, and
*Emily Anne Polachek*, Attorney.

*Stephen R. Hernick* argued the cause for appellee. With
him on the brief was *Jennifer Best*.

Before: HENDERSON, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Section 1533(e) of the Endangered Species Act ("ESA") allows the Fish and Wildlife Service ("the Service") to "treat any species as an endangered or threatened species even though it is not listed pursuant to" the ESA, provided that the Service fulfills certain criteria. 16 U.S.C. § 1533(e). One such criterion is that a species not itself endangered or threatened may be treated as such if similar in appearance to one that is. *Id*. But the Service has long recognized that § 1533(e) does not empower it to conduct a similarity of appearance analysis for any species that is already listed as endangered or threatened. Friends of Animals ("Friends") contests this interpretation, particularly in the context of the scarlet macaw, and argues that the statute does authorize a similarity of appearance-based listing for even those species that are already listed as endangered or threatened. The District Court below found in favor of Friends' interpretation of the provision, relying on the statutory text and overall purpose of the ESA. We now reverse.

## I.

Congress enacted the ESA in 1973 and authorized the Service to designate species—divided separately into Subspecies and distinct population segments ("DPS")—as endangered or threatened based on several criteria. 16 U.S.C. §§ 1532(16), 1533(a). A species is generally designated as "endangered" when it is "in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6), whereas a species is designated as "threatened" when, within the "foreseeable future," it is "likely to become an endangered

species," *id.* § 1532(20). The distinction is important because while the ESA contains an express provision prohibiting certain actions against endangered species, there are no similar statutory protections for threatened species. *Id.* § 1538(a). Instead, the Service must specifically issue "regulations as [it] deems necessary and advisable to provide for the conservation" of threatened species. *Id.* § 1533(d). Section 1533(d) also permits the Service to "extend[] the 16 U.S.C. § 1538(a)(1) prohibitions as to endangered species to all threatened species as well," *Sweet Home Chapter of Cmtys. for a Greater Or. v. Babbitt*, 1 F.3d 1, 5 (D.C. Cir. 1993), and the Service has done so, *see* 50 C.F.R. § 17.31(a). In that rule, the Service has reserved the ability to "promulgate[] species-specific provisions," *id.*, thereby enabling it to selectively withhold from a specified population protection that would otherwise extend to the threatened species by virtue of the blanket rule.

Congress also recognized that species visually similar to endangered or threatened species, but not independently listed as such, could pose an additional threat to those listed species if they were not afforded the same protections. For instance, a hunter or poacher could kill an endangered animal and claim that they thought it was an unprotected animal that closely resembles the protected species. Accordingly, the ESA also authorizes the Service to "treat any species as an endangered or threatened species even though it is not listed" pursuant to § 1533(a) of the ESA when: (A) "such species so closely resembles in appearance . . . a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;" (B) "the effect of this substantial difficulty is an additional threat to an endangered or threatened species;" and (C) "such treatment of an unlisted species will substantially facilitate the enforcement and further the policy" of the ESA. 16 U.S.C. § 1533(e)(A)–(C). By

regulation, the same protections applicable to listed endangered or threatened species automatically apply to those species treated as endangered or threatened based on similarity of appearance, although the Service may depart from the default extension of protections in species-specific rules. 50 C.F.R. §§ 17.51–52. In other words, if a species is treated as endangered because it looks visually similar to an endangered species, then the protections afforded to that endangered species are automatically extended to the visually similar species.

In 2019, the Service exercised its power under the ESA and extended protections to certain subspecies of the scarlet macaw, a parrot native to Central and South America. The scarlet macaw is subdivided into two subspecies: the Northern Subspecies and the Southern Subspecies. The Southern Subspecies is further divided into the Northern DPS and the Southern DPS. In the 2019 Final Rule, issued in February 2019 and made effective a month later, the Service listed the Northern Subspecies as endangered and the Northern DPS of the Southern Subspecies as threatened. Endangered and Threatened Wildlife Plants; Listing the Scarlet Macaw, 84 Fed. Reg. 6278, 6307–08 (Feb. 26, 2019). Exercising its § 1533(e) authority, the Service also treated the Southern DPS of the Southern Subspecies as threatened based on similarity of appearance to the Northern DPS and the Northern Subspecies. *Id*. at 6308–09. By regulation, this meant that the threatened Southern DPS would obtain many of the same protections as the statute affords to the endangered Northern Subspecies. However, the Service expressly carved out one such protection as inapplicable: Its rule allows import and export of Southern DPS and Northern DPS macaws born in captivity without a permit. *Id*. at 6309–10.



Friends brought suit in 2021, alleging that the Service had acted arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA") by failing to consider whether the Northern DPS of the Southern Subspecies should be treated as endangered—even though it was already listed as threatened—based on the Northern DPS's similarity of appearance to the Northern Subspecies. If the Service had done so, the Northern DPS would have received the same protection as an endangered species, rather than the "lesser" protection afforded to a threatened one. In the proceedings below, on cross motions for summary judgment from both parties, the

District Court ruled that the Service violated the APA, finding that its interpretation of § 1533 as precluding a similarity of appearance analysis for an already listed species was "flawed." J.A. 064. This was for two reasons: First, the District Court found that the Service's interpretation would render the term "any," as utilized in § 1533(e), "superfluous"; second, the District Court concluded that such an interpretation would contravene the ESA's core purpose to conserve, protect, and defend species from extinction. J.A. 063–66.[1]

In July 2024, the District Court issued an order denying in part and granting in part both the Service's and Friends' summary judgment motions. Deciding that the APA issue warranted "further explanation" from the agency, the District Court subsequently remanded that issue, amongst others, to the Service. J.A. 077 (stating that issues that "warrant further explanation . . . will be remanded to the agency"). It then noted that it "will . . . defer final decision on the precise parameters and duration of that remand," ordering the parties to "meet, confer, and submit a joint proposal on the scope and duration of the remand." J.A. 077. The parties ultimately submitted two separate proposals to the District Court and the District Court granted the Service's remand proposal in October 2024. In its October Order, the District Court stated that it had "remanded two issues to the Service for further explanation [in July] but deferred final decision on the parameters and duration of [the] remand" until October. J.A. 081. The Service subsequently appealed the District Court's denial of its summary judgment motion in December 2024, less than 60 days after the October Order. We have jurisdiction to review under 28 U.S.C § 1291.

---

[1] The District Court also decided a number of other issues raised by the parties in the proceeding below that neither party presses on appeal.

## II.

We first address Friends' myriad procedural arguments, each of which is without merit.

Friends first argues the Service's appeal is untimely as it filed its appeal more than 60 days after the District Court's July Order. The Service responds that its appeal is timely because it filed its appeal within 60 days of the District Court's October Order. The substance of their disagreement boils down to whether the July Order or the October Order "conclusively determine[d] the disputed question"—in other words, which of the Orders contains the "final decisions" from which an appeal may be taken. *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 328–29 (D.C. Cir. 1989) (citation modified).

We hold that it is the October Order, and as such, the Service's appeal is timely. The District Court's July Order did not "conclusively determine" the disputed question, in part because it left open the precise parameters and duration of the ordered remand. *Id.* at 329. Further, the District Court made clear in its July <u>and</u> October Orders that its July Order had been non-final. It stated in the July Order that it was "defer[ring] final decision on . . . that remand" and emphasized in the October Order that it had previously "deferred final decision on the parameters and duration of remand." J.A. 077, 081. We must take this express denial of the District Court's finality at its word. *St. Marks Place Hous. Co. v. Dep't of Hous. & Urban Dev.*, 610 F.3d 75, 80 (D.C. Cir. 2010). Given that the District Court made abundantly clear in its July Order that it was not yet done determining the scope of the remand, the July Order was not a final decision from which the time to appeal began to run; therefore, the Service's appeal is timely.

Friends' untimeliness arguments ostensibly extend to standing. The organization contends that the Service lacks standing to appeal because appeals from remand orders are interlocutory, the Service appealed from the October Order, and "interlocutory appeals are 'confined to the particular order appealed from.'" Appellee Br. at 26 (quoting *United States v. Stanley*, 483 U.S. 669, 677 (1987)). To state it more plainly, Friends claims that the Service's arguments related to the best reading of § 1533(e) could only have been raised on an interlocutory appeal from the July Order, which found that the issue should be remanded to the agency, and not the October Order, which related to the parameters and duration of that remand.

We find this claim unavailing. Friends' contention relies upon cases involving statutes that authorize appeals from specific orders certified by the district court, such as 28 U.S.C. § 1292(b). In contrast, this Court has jurisdiction to review appeals under 28 U.S.C. § 1291, which confers jurisdiction to review "final decisions" of the district courts. As explained above, the October Order is the "final decision" of the District Court. And that order implicitly adopted the July Order by express reference. Friends' second procedural argument thus fails.

Friends' third procedural argument—centered around the Service's Notification of Final Explanation, which was issued after the District Court's October Order—is equally unpersuasive. The Service noted in the Notification of Final Explanation that it was "explain[ing] why [it] did not conduct an analysis under [16 U.S.C. § 1533(e)] pertaining to the [Northern] DPS," and that it was now conducting such explanation "[i]n response to an order by the" District Court. Similarity of Appearance Explanation for the Northern Distinct

Population Segment of the Southern Subspecies of Scarlet Macaw, 90 Fed. Reg. 43395, 43395 (Sept. 9, 2025). Friends asserts that the issuance of this explanation "completes the [District Court's] remand" and "renders [the Service's] appeal moot." Letter Pursuant to FRAP 28j at 1–2, No. 24-5278 (dated Sept. 12, 2025). This argument is clearly incorrect under our precedent. It is a long-held tenet that "[a]gency compliance with [a court] mandate does not moot the issue of the correctness of the court's decision." *Norfolk and Western Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 128 n.3 (1991); *see also Maher v. Roe*, 432 U.S. 464, 468 n.4 (1977), *Schweiker v. Gray Panthers*, 453 U.S. 34, 42 n.12 (1981), *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 791 n.1 (1985). So too here.

Friends then contends that the Service provided a post-hoc rationale in its arguments on appeal because the Service had not explained in the administrative record why it was not conducting a similarity of appearance analysis for the Northern DPS, nor why the ESA prohibited it from doing so. But the reason why the Service did not provide any explanation is obvious—it believed that the ESA and contemporaneous regulation made clear that it could not conduct a similarity of appearance analysis for an already listed species. Further, Friends had not raised during the rulemaking process its claim that the Service *could* conduct this analysis, meaning that the Service was not on any sort of notice that it needed to address the issue. *See Cal. Cmtys. Against Toxics v. Env't Prot. Agency*, 928 F.3d 1041, 1049 (D.C. Cir. 2019) ("Generally, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue.")

(citation modified). Accordingly, Friends' fourth procedural argument also fails.[2]

## III.

We now turn to the merits. The Service contends that the District Court erred in ruling that it had acted arbitrarily and capriciously in refusing to consider treating the Northern DPS of the Southern Subspecies—which was already listed as threatened—as an endangered species based on its similarity of appearance to the Northern Subspecies. The dispute is fundamentally one about statutory interpretation and whether § 1533(e) of the ESA confers upon the Service the authority to treat a listed threatened species as endangered. A review of the statutory text, contemporaneous regulation, and statutory purpose confirms that the Service may not do so.

## A.

We review the District Court's statutory interpretation under the APA *de novo*. *Jazz Pharms., Inc. v. Kennedy*, 141 F.4th 254, 261 (D.C. Cir. 2025). As with any statutory interpretation issue, "we begin with the text." *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). In analyzing the text, we do not only read the specific language at issue, but

---

[2] Friends also presents an insubstantial argument based on the distinction between the Rule's publication date and its effective date, arguing that although the Final Rule published on February 26, 2019 became effective without alteration one month later, a challenge to designation decisions initiated on February 26 would be unripe while a challenge lodged a month later would not be. Such an argument clearly fails under our precedent. *See Humane Soc'y of the United States v. U.S. Dep't of Agriculture*, 41 F.4th 564, 571–72 (D.C. Cir. 2022) (holding that a Rule's publication date is the date that it becomes "law even if it sets a future effective date").

must also consider the language in the context of the entire statute. *Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 103 F.4th 45, 50 (D.C. Cir. 2024). Here, § 1533(e) means what it plainly says—that the Service can only conduct a similarity of appearance analysis for a species that is not already listed as endangered or threatened.

The text of the statute provides as follows:

The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to this section if he finds that—

A) such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

B) the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

C) such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

16 U.S.C. § 1533(e).

The first part of § 1533(e) appears to grant broad authority to the Service to "treat any species" as endangered or threatened "even though it is not listed pursuant" to the rest of the ESA. 16 U.S.C. § 1533(e). The plain meaning of the term

"any" is expansive and, read in isolation, suggests that the Service may treat "any" species as endangered or threatened, regardless of its inclusion on either of those lists. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020) (providing that a statute should be interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment.")

But statutory construction is a "holistic endeavor." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). Therefore, we must interpret "any species" in conjunction with the ensuing textual qualifier "even though it is not listed." 16 U.S.C. § 1533(e). The plain meaning—and the best reading—of this sentence is thus that the Service can treat as endangered or threatened "any species" that is "not listed." An examination of the three conditions that must be satisfied before the Service can invoke its authority under § 1533(e) underscores our conclusion. Prior to treating "any species" as endangered or threatened, the Service must first determine that: (A) "such species so closely resembles in appearance . . . a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the *listed and unlisted species*;" (B) "the effect of this substantial difficulty" poses a threat to the "endangered or threatened species;" and (C) "such treatment of *an unlisted species* will substantially facilitate the enforcement and further the policy of" the statute. 16 U.S.C. § 1533(e)(A)–(C) (emphases added). The conditions enumerated in (A) and (C), which expressly refer to "unlisted species," demonstrate that Congress intended to confer authority on the Service to treat an unlisted species as if it were a listed species.[3] And even though subsection (B) uses no such

---

[3] The District Court found that interpreting "any" species as being limited by "even though" would render the word "any" "superfluous." J.A. 065. Not so. Reading § 1533(e)'s qualifying

analogous language, the fact that it highlights the "effect of this substantial difficulty" posing an "additional threat to an endangered or threatened species" further demonstrates that Congress was concerned about the effect an unlisted species would have on a listed species. *Id.* § 1533(e)(B).

Friends posits that the word "unlisted" carries a different meaning. It argues that the term is an "easy shorthand differentiator[] from the species justifying the similarity of appearance treatment." Appellee Br. at 40. But that convoluted reading is inconsistent with the plain meaning of "unlisted," namely, "not appearing upon a list." *Webster's New Int'l Dictionary of the English Language* 2503 (3d ed. 1966). Further, in the context of the ESA, which throughout uses the word "listed" as a term of art to refer to those species that are on the "list" of endangered species or on the "list" of threatened species, "not listed" plainly refers to those species that are neither on the endangered species list, nor the threatened species list. *See, e.g.*, 16 U.S.C. § 1532(5)(A)–(B) (defining the term "critical habitat" in relation to those species that are "listed in accordance with the provisions of section 1533" or "now listed as threatened or endangered"); *id.* § 1533(c)(1) ("The Secretary of the Interior shall publish in the Federal Register a list of all species determined . . . to be endangered species and a list of all species determined . . . to be threatened species."); *id.* § 1538(a)(1) ("[W]ith respect to any endangered species of fish or wildlife listed pursuant to section 1533."). Reading the word "unlisted" as Friends suggests would be an

---

phrase—"even though it is not listed"—to cabin the term "species" to unlisted species does not deprive "any" of meaning. It simply defines the category to which "any" applies as unlisted species rather than all species. The term "any" ensures that all members of that defined category are covered. Accordingly, our interpretation provides all terms their ordinary meaning, with none read out of the statute.

awkward subversion of that term, especially when considering how "listed" has been used throughout the ESA. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 576 (2019) (holding that when Congress "uses a term in multiple places within a single statute, the term bears a consistent meaning throughout").

In sum, the text of §1533(e) unambiguously illustrates that the Service is allowed to treat an unlisted species as endangered or threatened, but it does not empower the Service to conduct a similarity of appearance analysis on an already listed species.[4]

**B.**

The above conclusion is bolstered by the Service's regulations. Two years after the passage of the ESA, the Service issued regulations interpreting the statute, including 50 C.F.R. § 17.50, which implemented § 1533(e). The Service's longstanding interpretation of the statute, codified in regulation and issued contemporaneously with the ESA itself "can inform

---

[4] The ESA was passed in 1973, and the legislative history's references to "unlisted" species further support our interpretation. For instance, the Senate Report underscored that "[i]f one species *is listed* under [§ 1533(e)], *but the other is not*," then the Service "may treat the *unlisted* species as an endangered or threatened species." S. REP. NO. 93-307 at 9, Endangered Species Act of 1973 (July 1, 1973) (emphases added). The House Report likewise highlighted that "[i]f the enforcement agencies are confronted by a situation in which they cannot adequately distinguish between *listed* and *nonlisted* species of animals, they are authorized to ban the importation of 'look-alikes.'" H.R. REP. NO. 93-412, at 12, Endangered Species Act of 1973 (July 1, 1973) (emphases added). These reports demonstrate that upon passage of the ESA, Congress was only contemplating the authority of the Service to treat as endangered or threatened a species that was not already on a list.

a court's determination of what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (citation modified). Here, the Service's contemporaneous regulation states that "[w]henever a species which is not Endangered or Threatened closely resembles an Endangered or Threatened species, such species may be treated as either Endangered or Threatened[.]" 50 C.F.R. § 17.50(a). While Friends posits that this language is ambiguous, arguing that it "can . . . easily be read as clarifying that even unlisted species may be treated as threatened or endangered pursuant to" § 1533(e), such a reading is not in accordance with the plain meaning of the text. Appellee Br. at 46. Indeed, no such "clarification" is needed because the terms "Endangered" and "Threatened" are defined in 50 C.F.R. § 17.3 as species that are "listed." This contemporaneously promulgated regulation thus underscores what the text of the statute already states—that the Service is authorized to conduct a similarity of appearance analysis for an unlisted species. Nothing in the text of the statute or the contemporaneous regulation authorizes the Service to conduct a similarity of appearance analysis for a "listed" species.

Finally, we turn to the purpose of the statute. The District Court below found that it would be a "strange" result if the Service was "prohibited . . . from enacting stronger protections for an endangered species if it found a visually identical species was at slightly less risk of imminent extinction." J.A. 065. Maybe so—it is somewhat confounding why Congress would intend the Service to have the power to take any species not listed and treat that species as endangered or threatened, but not the power to merely uplist a species already listed. However, it ultimately changes nothing. As the Supreme Court has held, statutory purpose cannot trump statutory text. *Southwest Airlines*, 596 U.S. at 463. Furthermore, Congress granted the Secretary the authority, when "necessary and advisable to provide for the conservation

of" a threatened species, to promulgate regulations granting additional protections to that threatened species that are akin to the protections conferred upon endangered species. *See* 16 U.S.C. § 1533(d). Thus, the statutory purpose to protect and conserve all threatened species is still fulfilled by our construction of the ESA.

## IV.

For the foregoing reasons, we reverse the District Court's grant of summary judgment in favor of Friends based on its finding that the Service acted arbitrarily and capriciously in refusing to conduct a similarity of appearance analysis for an already listed species under § 1533(e) of the ESA.

*So ordered.*